Yes, Mr. Cagle? Yes, sir. May it please the court. I'm James McCall Cagle. I'm an attorney in Charleston, West Virginia. In this case, I represent Donald L. Blankenship. Mr. Blankenship was at the time relevant to the charges in this case, the chairman of the board and the CEO of Massey Energy Corporation of Richmond, Virginia, a publicly held coal company traded on the New York Stock Exchange. Mr. Blankenship stands convicted of the misdemeanor offense of conspiracy to willfully violate mandatory mine health and safety standards for which he served the maximum penalty of one year in prison and paid the maximum fine of $250,000. This case is about multiple violations of Brady v. Maryland and U.S. v. Giglio. The number of violations in this case are frankly startling as stated by the U.S. District Court when that District Court denied the recommendation that the conviction of Mr. Blankenship be vacated. There are several categories that this court has noted, but first I want to mention to you that this case is a weak case contrary to what the District Court said, and I mean weak. The prosecution was of a man who as CEO was not in the mine, had not visited the mine during the periods of time that he's convicted of this conspiracy, which indeed is a misdemeanor, not a conviction, that he was acquitted of all felonies charged, and there were three in number charged, one of which was a conspiracy, which was a felon, one of the objects of that conspiracy. The verdict was delivered at the end of 36 days in the trial, one virtually one-third of which was spent in jury deliberations. The jury returned two times, indicated that they were hopelessly deadlocked. The judge obviously gave a instruction to go back and continue consistent with Allen that the indication from one juror who passed a note to the judge on what I interpret to be the 25th or 26th day of trial when the last witness was testifying, the note said, what is Mr. Blankenship charged with? At that point, it's obvious at least one juror did not know what the charges were. A reading, a careful reading of this record would indicate that this is ordinarily used for civil matters, not criminal matters. As indicated by the record, the defense offered no evidence whatsoever. Mr. Blankenship did not testify. No witnesses were called. They rested at the end of the case, thereby beginning two weeks of deliberations. The defense was fairly stated by the gentleman who represented him at trial that Mr. Blankenship is being prosecuted for who he is or what he is, not for what he's done, because the evidence simply was not there. Now, turning to that which is the subject of this, the court has indicated three categories of interest. First, I'll address the five witnesses, potential witnesses who were not called but were thoroughly interviewed by members of the Department of Justice, by investigators from the Department of Labor, and by FBI agents. There were five individuals who delivered information that was absolutely contradictory to the entire indictment and the theory of the case that was presented by the government. Those memoranda of interview were not provided, but they are favorable to the defense. They were contradictory to the evidence. They were impeaching of witnesses, and they were diametrically opposed to the government's theory of the case, and that would involve that he was operating for profits over safety. That was debunked by at least three of the five witnesses. Mr. Cagle, Judge Steele is here. I'm sorry to interrupt, but I guess what I'd like to get to is sort of the nub of this case, as I understand it, if we assume that these witnesses were in fact favorable and might have had material information, the question that arises is whether in the unique context of this case, where your client is the CEO of a company and these five witnesses were all employees at one time or the other of the company, and in fact were on the defense witness list, so obviously there was knowledge of the witnesses, whether your client and his team had a due diligence requirement to figure this out on their own. Well, they don't. They did not have a due diligence requirement. But don't our cases say they do? Your cases wrongfully state that. Well, that may be, but we're kind of stuck with that decision. I think not, Your Honor, and if you'll indulge me for a second. Sure, go ahead. I fully anticipated this question. Two of your decisions would indicate that that's not correct, that this panel can indeed consider that Wilson is bad law after 2004 in the decision of Banks v. Dredtke because Banks v. Dredtke rejects the very rationale of U.S. v. Wilson. Those two cases are Etheridge v. Northern and Western Railway Company, that's 1993 decision, and Qinyin, I'll spell it, Q-I-N-G-Y-I-N-L-I versus Eric Holder, Attorney General. That's the 2011 cases. Those cases will say to you, I believe, that you absolutely not only should but must find that what the district court followed in U.S. v. Wilson is, to put it bluntly, bad law, rejected reasoning by the U.S. Supreme Court 17 years ago. And beyond that, there is no evidence that these attorneys were less than diligent. The court makes a factual finding without conducting an evidentiary hearing that these lawyers were less than diligent. The record in this case would indicate these lawyers were as zealous as lawyers representing a defendant could be. If that's so, wouldn't we suppose that these witnesses were put on the defense witness list that there had to be a selection process? In other words, you had to know what those witnesses were going to say or prepared to put them on. You didn't put them on. That's a strategic issue. But if they're well-prepared lawyers, wouldn't you expect that before they designate somebody as a witness at trial, they would know and they at least know the scope of what the persons are going to say? Your Honor, I would call your attention to that witness list. It is in the sealed part of the joint appendix. That witness list is four pages long. It has, at the end, representatives of Ernst and Young. There is then a supplemental list with four more witnesses that says, no, I make that, with about six more witnesses that has among custodians from Alpha Natural Resources. There is no evidence that they knew what these witnesses, I call that witness a document. That's a document you submitted to the court and designated witnesses who were going to or could be testifying on your behalf so that you can prepare the other side for recognition of those witnesses and be prepared at trial. It's an information that's provided. So now when you say they over-designated, that's okay. But does that mean they weren't careful in their designations? I'm not saying that. I wasn't a trial counsel, but my interpretation... But I know that's not an excuse, is it? I'm not saying that, no. What I'm saying to you is there's no evidence that they were interviewed. The judge in the district court... It doesn't have to be interviewed. Somebody picked those witnesses, which are employees of the company, and they picked those witnesses because they knew about... The whole point of Wilson is not only that it imposes on lawyers, if it's equally accessible and those persons are persons to whom you would normally go, and that's exactly what your designation indicates. In other words, you have identified the witnesses that would help your side, maybe, maybe not, at trial. My point in this, your honor, is that by employing Wilson and saying that under Wilson, you're reflected in that filing that you've interviewed this and know what they're going to say is making a factual conclusion. I'm not suggesting you knew what they were going to say. I'm going to say you identified them on some criterion, which put them to the forefront, those witnesses, because they were designated to the court by your side, and now you're saying the fact that you didn't interview them and know what they were going to say when Wilson suggests they were equally accessible to you, you should have done that. It's a hard argument to make, isn't it? No, I think not. I think what you're misreading of not only that filing of a witness list would indicate, A, that they were accessible. Not all witnesses, I've tried hundreds of cases, not all witnesses will talk to you. You will know if Mr. Blankenship had retired from there. Mr. Blankenship personally by virtue of his conditions couldn't speak to him. Well, if you know a witness won't talk to you, you put them on your witness list when you're a trial lawyer? I tried cases too. I don't think when I didn't know what the witness was going to say, I'd indicate he was going to be my witness. Well, we have a disagreement. What my point is... Well, fair enough. No, you get the benefit on this argument, but my only point is these persons were specifically identified by your side. They're not buried in this big public corporation and you don't know where they are. And so, the question is under Wilson, did you fulfill the duty? Now, I understand your argument that Wilson may overstate the law, but right now at this point in time, you know, we're bound by that until we reverse it on the bank or maybe we find that the Supreme Court reversed it, as you say. And I'm asking you to do that. Now... Mr. Cagle, can I follow up on another factual issue? This issue of due diligence, I think, is also part of that analysis, the question of knowledge, actual knowledge on the part of the defendant. Does he know the violation? And it seems to me that a lot of these MOIs were discussing either conversations that witnesses had with your client or in one... Let me give you one example. There was a Steve Sears who told investigators that Mr. Blankenship started a safety program for individuals. It would seem to me that Mr. Blankenship would know whether or not he started a safety program for individuals. So why would we find a Brady violation simply because the government failed to produce that kind of information? Well, because I don't think that's the crux of what was important about the Sears interview. The importance about the Sears interview is that he debunks the profits over safety issue that was the driving argument of this... Right, but he debunks it in part because of things that Mr. Blankenship did to debunk that and or in other instances, conversations that Mr. Blankenship had with other witnesses. It seems to me that it's just in the unique circumstances of this case, you've got the CEO who presumably has a relationship with these employees. Why wouldn't he know? He knows what he knows. I mean, I understand that. I can't argue with you that I know what I know or that you know what you know. Of course, that's a fair common sense assumption. What I'm saying, though, within the context of preparing for this case, I've run out of time it appears, but in preparing for this case, if I might have your indulgence, please. Yes. That Mr. Blankenship's trial attorneys were deprived of knowing what the government had that was favorable that could be used, either in deciding how to try the case, who to call, and how to cross-examine witnesses against Mr. Blankenship. All of that is prejudice and that's what Brady is about. With just Neimeyer's indulgence, I did want to ask you a question about some other components of this case. In particular, the claim regarding the agency's imposition of this so-called bad ventilation plan on the company, which the theory goes may have been partially responsible for what happened, the tragic accident that occurred at the plant. You make this, I think, a fairly compelling argument that that might well have been a defense to any issue with respect to the company. We're here on a habeas petition. The district court ruled that none of that was relevant. Those evidentiary rulings weren't challenged on direct appeal. Hasn't the argument effectively been waived by failure to preserve the argument on direct appeal? Oh, I think not, Judge. Here's why. This information wasn't disclosed. That's the reason. The trial judge may well not have ruled the way that she ruled. If this information had been available, I submit there were a lot of information that would have been taken into account to consider how one ruled on that trial level as presented. It could have been an entirely different case, which was taken away from the defense by virtue of not just failing to turn this over, but in some cases, a conscious decision not to turn this information over as found by the DOJ in the proceeding against the U.S. attorney and his assistant. All right. Thank you, Mr. Cagle. You have some rebuttal. We'll hear from Mr. Booth. All right. Thank you very much, your honors. May it please the court. The government's withholding of witness interviews from five potential defendant witnesses and the MSHA internal documents did not violate Bradley. As to the witness interviews, Blankenship could have discovered the substance of those interviews with due diligence, and as the district court held, the information in the MOIs were not material. As to the MSHA documents, the district court correctly held that the evidence of them was either inadmissible or immaterial, and given the standard of review, which is an abuse of discretion, and given the fact that the 2255 judge was the same judge who proceeded a 36-day trial, there was no abuse of discretion in any ruling, and in any event, as the judge also found, most of this evidence would have been cumulative to the evidence that was presented. As to the due diligence requirement, in the Hope case, this court held that the government's failure to disclose witness interviews of potential defense witnesses in a sex crime case didn't violate Brady because the defense could have learned of their existence through a reasonable pretrial investigation. This case is much stronger than Hope for several reasons. First, the interviewees were Blankenship's mid- to high-level employees. He knew their positions at Massey. He knew the extent to which they were involved in the safety measures that he had instituted and how they were implementing them. He had put four of the five employees on his pretrial witness list, which implies that he had at least made a preliminary determination that they had or could present exculpatory evidence if he had called them. Third, in fact, Blankenship had interviewed Ojeda before trial, and if you look at the substance of that interview in the MOI, that was an extremely intensive interview. Blankenship's attorneys asked her about the Hazard Elimination Committee documents, documents sent to the Board of Directors, public speeches, whether Blankenship had asked her or and whether he knew of any former Massey employees that were working for another company. Fourth, his general knowledge of their testimony was shown by the extensive references to these witnesses at trial. In his reply brief, Blankenship has indicated that a lot of the information in the interviews was not revealed at trial. Well, we take a contrary view. For example, Blankenship says that with respect to Ojeda, she made statements in her pretrial interview that the privilege markings on the memos were relatively benign, and that contradicted the government's theory of the case that they had a sinister context, and Blankenship used the privilege markings to hide his nefarious schemes from others. Actually, that was covered at trial at length. I would point you to Joint Appendix 991 to, I'm sorry, 1191 to 1194, 2296 to 2298, and here's an excerpt from the closing argument that Blankenship did, and this is on 2656 of the record. Is it really so strange that these memos to Mr. Blankenship were marked attorney-client privilege? They were sent to him by the company lawyer. With respect to Brears, one of the Can I interrupt you for a second? I think I understand the argument with respect to due diligence, particularly given the unique relationship of this defendant to the reported witnesses and material, but Mr. Cagle led off with this sort of foundational argument that he says that circuit upon circuit is simply misread Banks. Banks has some pretty broad language in it that suggests that it should not be the case that prosecutors can lie and conceal, and the defendant has the burden then to discover the evidence. I get the point that we have this history of precedent that suggests otherwise, but why can't Banks be fairly read to reject this kind of, you know, the prosecution hides and the defendant must seek? Well, let me state there's two things about the Banks decision that I would like to emphasize to you. Yes, Banks did say that defense attorneys don't have to scavenge for his grading material with the property of Helen Devarney, but it's important to look at the facts of the case in Banks and what was the type of evidence that was withheld. One of it had to do with witness prep and another one had to do with information given about an informant. This is information that typically is either in the exclusive or near exclusive control of the prosecutor, and if that's the type of evidence that we're talking about, including also the evidence in the third circuit case and the fifth circuit case, a lab report and a receipt, then yes, a defendant should not have to go and try to scope out and find out where that evidence is. But where this is evidence that's freely available to both sides, where both sides have access to the evidence and get to it, then our submission is that Brady does not do away with the due diligence requirement, or at least this court fairly applies the due diligence requirement in that scenario. Again, neither Banks, neither Dennis, the third circuit case, or Vanoey, the fifth circuit case, involved evidence that was freely available to both sides. In the case where the evidence is not only freely available to both sides, where the defendant puts four or five of these people on his witness list, interviews one of them extensively before trial, and then says, by the way, the reason he didn't call any witnesses in his own case was, and this is at page 2626 of the joint appendix, I told you in opening it may take us a while to put on evidence that indicated Massey did not want citations. I didn't realize that we were going to do it with the government's key witness. So my suggestion to you is twofold, Judge Diaz. One is that neither Banks nor the cases that have pretty much are limited to due diligence exception don't involve this scenario. And even if at some particular point this court were to think about it, it would have to take the in-bank court to do it because this court has repeatedly said it, or recently in the Zook case, which is in 2018. But we understand the situation in which evidence which is not readily available to the defendant is one in which we a Brady violation in this case, right? Because the prosecutor suffered consequences as a result of not disclosing it. I guess you're saying that in terms of the effect and the prejudice, there is none because of the fact that the defendant had equal access to the information. Well, Judge Diaz, your first question was, there was a Brady violation. No, we do not believe there was a Brady violation in this case because there was not an improper withholding because this is a case that is not in the Zook case. We agree, of course, as OPR found that there was a violation of the government's internal discovery procedures, which are much broader than the due process clause of the Fifth Amendment. Fair enough. And again, your foundational question is whether you want to eliminate the due diligence requirement is one for the in-bank court, not for this panel. And again, we would distinguish the situation where the evidence is freely available to both sides. Counsel, if I could pick up on the last thing you said, I don't think you take the position that the mission documents were available to the defendant. And in particular, I'd like to discuss the bias documents. Those don't seem to be the subject of admissibility decisions by the district court. The argument I think that the district court made was that, well, they don't necessarily reflect the whole agency's view. And they were cumulative. And I think the third reason was, well, there was other evidence to justify the conviction beside this. But I mean, those are some pretty strong language in those documents. And I'd really like to hear your opinion on that. I mean, the cumulative seems difficult. I know there's testimony about a strained relationship, but, you know, the expletives and the graphic language, you know, if that was if we were to consider this, you know, comments made by police about a potential criminal defendant, you know, I mean, it would be a I would think it would be a challenging case. Why don't the bias documents alone, even if you're right on the other issues, cause you a problem under Brady? Because it's our position here is the district court implicitly found that the evidence that several mission employees right after the explosion, which, by the way, the party stipulated was not an issue in this case. These comments occurred after the there's no rule of evidence that permits this type of of comments to be admitted into evidence under the rules. This is not a case where a witness is biased. This is not a case where a charging decision has been accused of bias, where the U.S. attorney, for example, may have faced his charging decision on race or religion. These are comments made by mid level or higher level employees in the federal government casting aspersions on the defendant, primarily because they felt he was responsible for the mine explosion. That's not admissible. And as the district court indicated, that certainly isn't indicative of agency bias. Again, the agency bias question, which Blankenship skillfully brought out at trial, was really all he was entitled to. And he brought that out over and over again. It was a statement. Sure. But yeah, this is not legally relevant bias. This bias, for example, that's different. If a witness comes in and he's biased. Sure. Under able and a number of Supreme Court cases that is admissible. And if that had been withheld, that would be relevant. But just an employee in the federal government making a vulgar comment about a soon to be defendant. That's not it. There is no case cited by Blankenship is brief. So this is this is admissible evidence. And the district court was absolutely correct. And so, again, we think that the extent that there was bias in terms of the contentious relationship between Massey, Blankenship and Misha thoroughly revealed the wouldn't have made it. So what I realize that issue was addressed, but obviously I would think the defendant would have been able to address it with greater force, or at least would have attempted to had they had these documents. Now, your position is that those would not have been admissible. And I guess we don't have a ruling on that because they weren't disclosed and it addressed. You know, it is and you maybe this may be unfair. You said that the defendant didn't cite a case that said they were admissible. Do you have authority on facts like these with you? It's not just a random federal government employee. It's five or six things, you know, to safety where that was deemed inadmissible on the question of agency bias. And maybe it is. I'm not suggesting you're wrong, but if you have a case, I'd like to look at that. I don't have a case specific. Again, the district court indicated that it was very skeptical that this was evidence of agency bias. He pointed out, for example, that at one point, one of the supervisors had disagreed with one of the comments made. Right. Correct. I am saying I have there is little doubt that agency bias, again, with respect to perhaps a charging decision, would be admissible at trial. But there's nothing that we have found in the federal rules that would indicate that a federal government employee's hostile remarks about a defendant after the explosion. Remember, Judge Quattlebaum, all virtually all of the statements made in these mission materials were made after the explosion in this case. And remember, again, I hate to belabor the point, the district court, the parties agreed that the causes of the explosion were not part of this case. And that's why the court emphasized that that and whether Misha's disciplinary actions and the cause of the explosion and all that was not admissible. And all of the only question before you is, was that an abuse of discretion by a district court judge that had sat through the whole 36 day trial and is would be in the best position to decide whether or not a piece of evidence is withheld would have been admissible under the rules. And remember, under the Supreme Court's decision, it would if it's not admissible evidence. It doesn't violate Brady. Now, there is some courts of appeals that said, well, if it could have led to admissible evidence, this court hasn't bought that exception that it might be. But there's nothing in this record to show that that would have led to admissible evidence. What you have here, again, you have employees who are asking this person's on the defendant after a mine accident that killed 29 people calling, there's a scantilogical Obama. Yeah, just just you mentioned that this is an abuse of discretion standard of review for us. And I mean, I think that's in certainly evidentiary rulings. I know we review for abuse of discretion. Why do you say the decision about whether just pay? I'll just the bias one since we've been talking about that. It were a Brady violation is an abuse of discretion. Why? Well, what is that? I'm sorry, just well, I didn't mean to go ahead. No, no. I think you were getting to my point. I'm trying to figure out. I mean, the district court's evidentiary rulings are abuse of discretion. But the claim that these are Brady violation is that review? No, Judge, it is not. The Brady violation is de novo. However, under Brady, under the Supreme Court's decision in wood, inadmissible evidence is not material under Brady. Sure. No, I understand that. Right. So if the district court has held that all of this mission material, pretty much all of it, it's slightly different rational breach was inadmissible evidence. All you do is make a determination as to whether there was an abuse of discretion on the part of the district court in making that admissibility determination. If you don't, but on the but on the bias evidence that wasn't part of the rationale of the district court. Since you've asked about it. That's called Obama. I think I probably need to read what the district court said. Yeah, and I could be wrong, but I thought the reasons were it was cumulative. It was not the agency's position. And there was other evidence beside it that, you know, that would have justified the conviction. Well, for example, on page on the joint appendix, 46, of course, emails tending to show bias on behalf of individual MSHA employees does not necessarily substantiate a claim that the agency itself was biased against the movement or massive. In fact, as the movement movement that is blankenship below the sentiment expressed in at least one of these two emails was directly overruled by the head of mission. This supports the notion that decisions made on behalf of agency were not impacted by bias held by individual mission employees. And that's on page 46. Yeah, I'm familiar with agreement. Right. The court is effectively saying here that you may have expressions of hostility or anger, scatological references by some mission employees towards blankenship. That doesn't amount to an agency bias. Agency bias would stand on a different footing than a stray or a stray comment. One employee, five employees. That's inadmissible evidence. There's another comment or two earlier on in the opinion, but it's pretty obvious that the district court did not make any finding of agency bias in this case. Again, you had scatological references. That's all. Mr. Booth, Mr. Cagle led his argument with a sort of background of the prosecution of his client. The fact that, as he put it, that he was prosecuted not for what he did, but for who he was. The fact that this was a closed case, the jury was out for a couple of weeks. Apparently, the judge had to give two separate Allen charges. And I think maybe the argument is that that we should find a Brady violation in a closed case. Is there any authority for that proposition? No, there isn't. What is important is whether or not the evidence that was withheld may have would have caused a reasonable probability that the outcome would have been different. That's what the Brady test is. Whether or not the jury was out for a certain period of time, whether the trial was 36 days, whether there was an Allen instruction, are really factors that do not bear on the issue. For all we know, the jury may have been hung up on the two felony charges that they ultimately acquitted Mr. Blankenship on. And in a 36-day trial involving a technical defense involving whether there was a willful violation of the statute, it's not necessarily unusual that the jury may have had some questions about it. But the only question that you have to decide is whether or not the omitted material, assuming they're admissible, if they're inadmissible, that's a different matter, would have created the reasonable probability of a different result. And that's the only question we submit that you have. We submit the district court found that didn't happen. There was no reasonable probability. If you look at the defense in this case, Blankenship did a very, very targeted and specific defense. And that's why he said, for example, at the end, I didn't have to put on any witnesses. He knew exactly where he was going. He knew exactly when he had Blanchard, the government's main witness, testify at the end of cross-examination. I wasn't involved in a conspiracy. He presented a very, very specific defense based on all the information he had. And all that information was given him by Blankenship because he knew what was important to show the safety measures he took and why he tried to reduce citations. None of this other things, including the MSHA. I'm sorry, am I out of time? Yes, you are. I'm sorry. I just don't see it here. I'm sorry. Let me hang up. I would ask you to affirm the judgment. If you have any further questions, I'll be happy to answer. Thank you. Thank you very much. Let me unmute myself. Mr. Cagle. Yes, sir. Thank you. I want to address the question that was recently asked about the of a case as being relevant to the termination of a Brady violation. Both were cited by the government in their brief. One is Weary v. Cain, a U.S. Supreme Court case of 2016. The other is the Bartholdt case, which was a Fourth Circuit case decided in 2013. Each of them considered the weakness of the case because it says when considering the context of all the evidence, it is important to determine the effect of that on the ruling of Brady or not on what you withheld. That's the determination of why a withheld piece of evidence is material or it would have prejudiced a person. It prejudices a person more in the context of a weak case. That's why I made that argument. As to the MCHR materials, they are frankly shocking in what they said. They are not coming just from the Mt. Hope MCHR that was addressing the UBB mine. They come from the highest levels of MCHR in Arlington, Virginia. One of them comes from the person who was charged with the duty of determining how death cases would be handled. I point out to you that they say it was after the explosion, but it was before the indictment. That's why that information was important. It could have been used. It would have been relevant under Rule 401. It's a relevancy issue whether or not it makes a fact in dispute of consequence more or less probable. Those are standard information that is supposed to be delivered under Brady. When the judge ruled on what is relevant or what was going to be admitted in MCHR, she didn't have that information. That's one of the ways that Mr. Blankenship and his defense was prejudiced in this case. It's not just that he could have called five witnesses that he may or may not have been able to interview, which I still say is a question of fact, but it is what would the quality of his defense have been had he had it. His lawyer was among the most skillful cross-examiners in this country. What might he have done with that scatological information about Mr. Blankenship, which occurred before the decision was made and charged him with the nebulous notion that he was never accused of advance warning. He was prosecuted on things nobody else was ever accused of, ever, and charged with knowledge of things that happen deep inside a man when he's sitting as chairman of the board and CEO. Now, those are the violations that they try to put on you, but they are not consistent with what MCHR documents say they even believe to be a violation or even understand to be a violation. The MCHR material and its failure to disclose is among the most critical in this case. It is equal to the withholding of the information from the five witnesses who used to be under his employment, and I will tell you again that he could not have interviewed him. He could not have spoken to him. It would have been a bond condition. The matter of the judge's rule about MCHR and about causation, it really was a stipulation that we're not going to try this case on causation, but I point out to you, had that information been available, including the concern expressed by MCHR itself that our report indicates we may be responsible, and indeed my client thinks they were responsible because of the ventilation plan, had she had that material, the rulings on the evidence would have been different. Thank you. Yes, Mr. Cagle. Thank you very much for your argument, Mr. Booth, for your argument. Our practice, as you know, is to come down and greet counsel, and the best we can do is extend our greetings here today, but I know you'll both be before us again, both of you. I think, Mr. Cagle, you've been before several times, haven't you? I have, yes, I have. I'm old. I'm old. We'll see you more, I'm sure. Anyway, it's good to hear from you both, and we appreciate having your arguments. With that, we'll adjourn court until this afternoon. Thank you. This Honorable Court stands adjourned until this afternoon. God save the United States and this Honorable Court.
judges: Paul V. Niemeyer, Albert Diaz, A. Marvin Quattlebaum Jr.